## HOLT v. HOLT.

No. 6256.

United States Court of Appeals for the District of Columbia.

April 15, 1935.

Rice Hooe, Levi H. David, and Alan B. David, all of Washington, D. C., for appellant.

R. A. Cusick, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

HITZ, Associate Justice.

This is an appeal from a decree of limited divorce with alimony made by the Supreme Court of the District of Columbia.

At the time of their marriage the parties were students at a college in Maryland; they were married at Baltimore in February, 1931; came immediately to live with the parents of the husband in Washington; separated in June, 1931; a decree of absolute divorce was obtained by the husband in Nevada in August, 1931; and the suit for limited divorce was filed by the wife in the Supreme Court of the District of Columbia in September, 1932.

At the time of the marriage the husband was twenty-two years old, and the wife twenty. Neither had any financial means or employment, or ability to earn a livelihood in these difficult days. The relatives of each appear to have had some limited means, and to have supplied whatever money and support was used to sustain the marriage while it lasted, and the litigation which followed it.

After a little more than three months together, consumed largely in quarrels which each party blames upon the other, the wife, on June 5th, returned to her relatives in Baltimore, while on June 11th the husband left his father's house in an automobile saying he was going to New York or to Maine in search of employment. But before reaching Baltimore he changed his course for California, to visit relatives; and before reaching California he changed it for Reno, to get a divorce.

He arrived in Reno on June 20th, where he rented a room, and where, on August 3d, being the day after the expiration of the statutory period of six weeks' residence, he filed a suit for absolute divorce on the ground of the extreme cruelty of his wife.

Written notification of this action was sent to the wife in Baltimore, with a request that she waive notice of subsequent proceedings, while shortly thereafter a telephone conversation took place between the parties.

On August 18th the defendant, with a married sister, arrived at Reno in another motorcar, where they met the husband, and, later his attorney, in whose office the wife was formally served with process.

The result of their confabulations was that the husband's attorney—though advising her to seek independent counsel, which she declined to do—prepared an answer for the wife, which she acknowledged and filed, wherein, for lack of information, she denied the husband's allegation of Nevada residence; denied his charge of extreme cruelty; waived notice of subsequent proceedings; consented to immediate trial; and prayed leave to resume her maiden name.

This answer being executed on August 20th, the wife left Reno on August 21st, after considerable entertainment by the husband, but without awaiting the trial, which occurred on August 25th, when the only witnesses were the husband and his landlady. The landlady testified that she rented the husband a room in Reno on the 20th of June, and had seen him about the house on practically every day since that date. The husband testified that he came to Reno on June 20th for the purpose of making his home there for an indefinite period; that his wife's extreme cruelty began a week after their marriage; consisted in continuous faultfinding and argument, varied by threats of suicide; culminated in an attempt to choke him; was terminated only by her desertion; that all of the trouble was due to her fault; and that she came out to Reno seeking a reconciliation, which he considered useless and refused. A decree of divorce a vinculo was thereupon granted on the same day, and on the next day the plain-

tiff left Nevada, where he has never since returned.

In September, 1932, the wife brought suit in the Supreme Court of the District of Columbia for a limited divorce and alimony because of·the desertion and cruel treatment of her husband.

In this bill the wife alleged that both parties were residents of the District of Columbia; attacked the Nevada divorce as fraudulent; averred that she resumed marital relations with her husband in Reno, became pregnant thereby; suffered a miscarriage therefrom; and has been unable to work or support herself since.

She further avers that she left Reno with an understanding that her matrimonial difficulties had been amicably adjusted, and she remained in that belief until after the decree of divorce had been entered against her and she was notified thereof by letter from her husband.

When she later informed him of her pregnant condition, he publicly denied responsibility therefor; and when she retained counsel and sought a conference with her husband, he left the District of Columbia and did not communicate with her thereafter.

The husband's answer to this bill denied residence in the District of Columbia; alleged residence in Nevada since June, 1931; and set up the Nevada divorce as having dissolved the marriage between the parties and extinguished any right to support or alimony from him.

He further denied desertion or cruelty while here; or resumption of marital relations while in Reno; or any understanding with the wife to compose their difficulties or to discontinue the proceedings for divorce. But he admitted that when his wife later informed him of her pregnancy he publicly denied paternity of the child and ordered her from his father's house.

Both parties, and their relatives, testified in support of these pleadings, and if we regard the wife's allegation of resumption of marital relations in Reno as established, which, we think, the evidence requires us to do, that is of conclusive importance in both courts. For the wife, in her pleadings and evidence in the Washington court, sets up this fact as occurring after all the matters relied on in her complaint to justify her divorce—except one, which will be later discussed—so that she condoned in Reno the earlier cruelty she complains of in Washington. And the same acts would operate to the same effect in Reno, and would oust whatever jurisdiction the Nevada court ever had in the matter, for though we have seen much of the liberality of Nevada practice, we assume that even in that forward-looking jurisdiction parties to a cause of divorce may not litigate by day and copulate by night, inter sese et pendente lite.

But the wife, having executed her answer in Reno, which was not filed until after she left that jurisdiction, was not represented at the trial there, and the alleged resumption of marital relations was not called to the attention of the court there. But it is brought forward in the court here in a manner that forces it upon our attention, and while the trial judge made no finding of fact on the subject, the evidence is sent up in the record, and, in our opinion, supports the allegation of the wife, who is corroborated by her sister and her physicians to an extent overcoming the denial of the husband.

The trial court held that the husband had no legal domicile in Nevada; that his residence there was simulated only; that his domicile was in the District of Columbia throughout the period of the litigation; that the Nevada decree is entitled to no faith and credit in the District of Columbia; that the husband deserted the wife when he went to Reno; and that she is therefore entitled to a limited divorce and alimony here.

From a decree to this effect we have this appeal, with sixteen assignments of error, including many repetitions and restatements of the same contention, all of which have been examined, but only a few of which need be discussed.

For we consider the Nevada decree to be of no validity here because neither party was ever legally domiciled in that state, and because of the collusion of the parties in the Nevada proceedings.

The wife never asserted domicile in Nevada; and while the husband testified in the court at Reno that he came there for the purpose of making it his home for an indefinite time, he also testified in the court at Washington that he went to Reno to procure a divorce.

He filed his suit on the day after his six weeks' preliminary sojourn expired, and he left the jurisdiction on the day after his

decree was entered, never thereafter returning, and while he attempts to explain his continued absence by illness in his family and the exigencies of this proceeding, the trial court made formal findings of fact that the husband's sole purpose in going to Reno was to procure a divorce; that he had no purpose of making his domicile there; and that he left Washington for Connecticut to avoid process in this suit; all of which findings are supported by the evidence.

This case is governed by Andrews v. Andrews, 188 U. S. 14, 23 S. Ct. 237, 47 L. Ed. 366, where it was held that legal domicile within the state is essential to a divorce having extraterritorial effect under the Constitution; that the appearance of one or both of the parties in the court of divorce could confer no jurisdiction in the absence of legal domicile; and that it is open to another court where such a decree is pleaded to determine for itself whether the plaintiff in the foreign divorce had acquired a bona fide domicile in the foreign jurisdiction.

And though the Andrews Case arose upon a Massachusetts statute denying validity in that state to divorces procured elsewhere by its inhabitants for causes arising in Massachusetts, the doctrine of the case as announced by the Supreme Court is clearly controlling here. While in the earlier case of Atherton v. Atherton, 181 U. S. 155, at page 167, 21 S. Ct. 544, 548, 45 L. Ed. 794, Mr. Justice Gray—previously Chief Justice of Massachusetts—said of this statute that it "made no change in the law, but, in the words of the commissioners upon whose advice it was first enacted, 'is founded on a rule established by the comity of all civilized nations; and is proposed merely that no doubt should arise on a question so interesting and important as this may sometimes be.'"

The Nevada statute here in question states its jurisdiction to divorce in terms of actual residence within the state, rather than in terms of legal domicile, but there is no authority in the Supreme Court for giving extraterritorial faith and credit under the Constitutional provision (article 4, § 1) to any decree of divorce granted in the absence of legal domicile within the jurisdiction of the court making the decree, no matter what the statutory language of the lex fori may be.

Since control of the matrimonial status lies in the law of the domicile of the parties to the marriage, the decrees so casually granted by a few of our states to sojourners, tourists, and birds of passage have no extraterritorial validity or effect in the District of Columbia under the Constitution. And while it is probably true that a law of divorce like our own, which is based on adultery only, is now neither adequate nor appropriate to the life of the community, and tends to produce a train of perjury, bigamy, and bastardy, yet the constitutional rule is not to be relaxed by the courts, though the evil may be recognized and corrected by the Legislature whenever it sees fit to do so.

When this controversy appeared in the trial court here, and the wife by her pleadings and evidence set up her resumption of marital relations at Reno, in legal effect she had condoned the prior offenses of which she made complaint. But when she later informed her husband of her pregnancy, and he publicly repudiated responsibility therefor, which he admits that he did, he was guilty of a new offense of cruelty which of itself, with its inherent accusation of unchastity, was sufficient to warrant the decree of limited divorce, but which also worked a revival of the earlier charges of cruelty and desertion otherwise condoned by the conduct at Reno.

For the foregoing reasons we hold that the Nevada decree of divorce is not valid in the District of Columbia, and that the decree of limited divorce with alimony entered by the trial court here in favor of the wife is good.

The following authorities are thought to support the views of this opinion: Bell v. Bell, 181 U. S. 175, 21 S. Ct. 551, 45 L. Ed. 804; Streitwolf v. Streitwolf, 181 U. S. 179, 21 S. Ct. 553, 45 L. Ed. 807; German Savings & Loan Society v. Dormitzer, 192 U. S. 125, 128, 24 S. Ct. 221, 48 L. Ed. 373; Haddock v. Haddock, 201 U. S. 562, 26 S. Ct. 525, 50 L. Ed. 867, 5 Ann. Cas. 1; Thompson v. Thompson, 226 U. S. 551, 33 S. Ct. 129, 57 L. Ed. 347; Benson v. Benson, 59 App. D. C. 271, 40 F.(2d) 159; Jacobi v. Jacobi, 45 App. D. C. 442; Diggs v. Diggs, 53 App. D. C. 56, 288 F. 262; Nehrbass v. Nehrbass, 45 App. D. C. 458; Hitchcock v. Hitchcock, 15 App. D. C. 81; Marshall v. Marshall, 55 App. D. C. 173, 3 F.(2d) 344, 40 A. L. R. 624; Phelps v. Phelps, 28 App. D. C. 577; 19 Corpus Juris, p. 51, § 93, p. 83, § 192; Nevada Statutes 1931, chapter

542

97, p. 161; chapter 147, p. 238; chapter 222, p. 412; D. C. Code, 1929, title 14, § 63.

The decree of the Supreme Court of the District of Columbia is therefore affirmed.

GRONER, Associate Justice (concurring).

I concur on the ground that the Nevada court never obtained any jurisdiction of the wife; that her answer filed in the Nevada suit was obtained by the fraud of her husband, and therefore was without effect. German Sav. & Loan Soc. v. Dormitzer, 192 U. S. 125, page 128, 24 S. Ct. 221, 48 L. Ed. 373; United States v. Throckmorton, 98 U. S. 61–65, 25 L. Ed. 93.

But I think the ground of collusion in the Nevada proceeding, on which the opinion is made to rest in part, may not be examined in this cause. United States v. Throckmorton, supra, 98 U. S. 61, at page 65, 25 L. Ed. 93; Lanktree v. Lanktree, 42 Cal. App. 648, 183 P. 954, 955; Holmes v. Holmes, 189 Iowa, 256, 264, 176 N. W. 691; Sudbury v. Sudbury, 179 Iowa, 1039, 162 N. W. 209, 212; Littlefield v. Paynter, 111 Kan. 201, 204, 206 P. 1114.